### BRADLEY *v.* PERKINS.

1. MASTER AND SERVANT — APPRENTICES — DISCHARGE FOR DISOBEDIENCE.

An apprentice is not guilty of willful disobedience, or such refusal to work, as justifies the master in discharging him,

or impòsing a penalty, where, on the foreman asking him to
work extra hours at night, he told him that he did not want
to work, because it was cold, on account of which his feet
were troubling him, and that he should take the work to
some one nearer a stove, and the foreman said nothing fur-
ther, but got another man to do the work.

2. SAME—CONTRACT—INFLICTION OF PENALTY.
    Where a contract of apprenticeship authorizes the master, in
    case of breach, merely to discharge the apprentice, and not
    to impose a penalty, the statement of the master to him that
    he could leave, or continue to work on an agreement to re-
    main 30 days above the time provided in the contract,
    amounts to a discharge, which, not being warranted, justifies
    him in leaving, and suing for what is otherwise due under
    the contract on wrongful discharge.

3. SAME—DISOBEDIENCE—RIGHT TO DETERMINE.
    The provision in a contract of apprenticeship that if, for any
    acts of disobedience of the apprentice, the master shall deem
    it best to discharge him, half the apprentice reserve fund
    shall be forfeited to the master, does not give the master
    authority to determine what constitutes an act of dis-
    obedience, but merely to discharge in case of such an act.

Error to Kent; Perkins, J. Submitted October 20,
1904. (Docket No. 67.) Decided December 7, 1904.

Assumpsit by Harry Bradley, by next friend, against
Willis J. Perkins to recover an apprentice reserve fund.
There was judgment for plaintiff, and defendant brings
error. Affirmed.

Plaintiff was apprenticed to the defendant to learn the
machinist trade. The period of service provided for was
three years. Aside from the regular compensation for his
services, the agreement provided that at the "expiration
of the second year there shall be a total apprentice reserve
fund of $72.00 in the possession of Perkins & Company in
favor of the second party, subject to forfeiture in whole or
in part, as herein specified." It also provided for the pay-
ment of the $72 at the expiration of the third year of faith-
ful service. The contract further provided that the "party

of the second part agrees on penalty of forfeiture of
entire apprentice reserve * * * to remain and continue
in the service of said party of the first part for the full
term of three years; and if for any acts of disobedience,
said party of the first part shall deem it best to discharge
said party of the second part, then the one-half of the
apprentice reserve * * * shall be forfeited." It also
provided that refusal to work the same number of hours
as other men in the shop are required to shall constitute
just cause for dismissal.

There was a valid requirement of the defendant with its
employés, in cases where there was necessity of hurrying
the work, that they should work overtime. Such work
overtime was paid for, and applied upon the contract.
Plaintiff had frequently worked, when requested, in ac-
cordance with such requirement. He continued in defend-
ant's service two years and ten months. He then left its
employ under circumstances detailed by him as follows:.

"We were working overtime there, nights, erecting.
They took the stove down in the machine shop, and it was
very cold. It was along in the winter, and it was cold,
and I had been having trouble with my feet being chilled.
I was troubled with my feet on account it was cold all the
time. The shop was cold; and I thought, after I worked
ten hours, I didn't want to work after that on account of
the cold. The foreman came around with a job. He
wanted me to work that night. I told him it was cold. I
didn't want to work. I had trouble with my feet. To take
the job to some one nearer the stove. And he didn't say any-
thing, but walked off with the job. He gave it to somebody
there in the shop. He didn't say anything to me about being
angry. Said nothing to me about being punished the next
day if I didn't do it. I had trouble on and off three or four
weeks with cold feet—with chilblains. The stove had
been down three days. There was no way of keeping
warm while I was there at the lathe attending to my work.
I was not there afterwards, after they put up the stove.
The superintendent came around the next morning. He
wanted to know why I didn't work. I told him on ac-
count it was so cold there, and I had trouble with my feet.
He said that was no excuse at all. I told him I thought.

it was.   I stood around all day with cold feet, and they were all complaining around where I was of being cold. We had talked of different things.   All I remember, then, he told me for penalty I would have to serve thirty days onto my time, or else quit.   I thought a minute, and told him I didn't like that very well, and I turned around and went out of the office, thought about it a little while, and then I went and gave in my time into the office.   I took off my overalls and went to the office.   I went to the superintendent first when I went into the office, and told him I would give in my time; that I was quitting on account of what he said.   He didn't say anything.   He went to the office after the money, and he told the book-keeper to give me my pay, and I told him I had some back money here.   'No, sir;' he says, 'you forefeit all that if you quit.'   I told him I didn't think that way.   I meant by 'back money' the $72."

Plaintiff testified that immediately after this interview he went to Mr. Perkins, and Mr. Perkins declined to take him back, except upon the imposition of the penalty of thirty days' more work.

Defendant's version of the transaction, as testified to by its foreman, Turner, is as follows:

"I remember January 24th having some extra work to do, and asking him to stay and work with others.   We had some tool steel cams to make for a gas engine—three of them.   They were to be bored and turned.   The order came in that they were in a hurry for them.   I think I had five men that I wanted to stay that night.   I think three or four remained altogether.   I asked Harry Bradley to remain to bore and turn a cam.   I showed him the piece of work about six o'clock, and explained what was to be done to it, and asked him to stay and do it.   I showed him the cams, gave him the dimensions on them, told him what had to be done with them.   He said he was not going to stay.   I asked him to stay the same as I did the other men that stayed.   One of the other men stayed.   There were other men on their machines staying that night.   He said he was cold.   If he said anything about chilblains I did not hear it, or I don't remember of hearing it.   The first thing he said he was not going to stay. I told him they wanted him to stay pretty badly.   I told him he had better stay and do the work, or he would have

to settle with the superintendent for it. That was Mr. Houn. I didn't listen to him then. I saw he was angry. I thought he was not going to stay. I turned around. I had some business with some of the other men, and I left him. He· seemed to be angry. I don't remember the name of the man who did this piece of work that night. I don't remember the man that did it. I remember I had a part of it done that night in this same room. * * * I do not remember any remark to me about giving the work to some other man. He might have said such a thing, but I don't remember of it. I reported the refusal of Harry to work at that time to the superintendent in the morning."

The superintendent, Houn, testified as follows:

"Three men were required to remain for that extra work that night. It was the custom among our employés, when extra work was required, to have more or less of them remain for it. That was one of the rules of our shop. The next morning I came down, and met Mr. Turner, the foreman, at the office. I had a report from the foreman that Harry Bradley had refused to remain and work the night before. I called Mr. Bradley into the office. I asked him why he didn't stay the night before. He said he had cold feet; it was cold. Well, I didn't take much stock in that, and I told him that was a poor excuse for not staying; that he had stayed there all day and said nothing about it, and other men stayed there all day and said nothing about it. I told Mr. Bradley that it was customary for us to lay the boys off a week or ten days at a time, or try to get them to behave themselves, and that they seemed to come back feeling good-natured and cheerful, and said they wished they had another week. It seemed to be a good thing for them, but that we would adopt a new plan, by setting them back thirty days; and he hesitated about going to work. I told him he might go to work or quit; he could suit himself. He said that he couldn't afford to lose any time, and I said, 'Then you better go to work,' and I left the room, and told the boy to go out and go to work; but he could suit himself and quit. * * * About half or three-quarters of an hour after this conversation he [plaintiff] left his work, demanded his time, and I simply told him he could have it, and took him over to the bookkeeper and ordered his time paid."

This suit was brought to recover this apprentice reserve

fund of $72. The court instructed the jury that, if the plaintiff was guilty of willful disobedience to the orders of the foreman in refusing to work, he could not recover; but, if there was no such willful disobedience, he was entitled to recover. The court stated the question to the jury concisely thus:

"If you find from the evidence in this case that the plaintiff had good excuse for not working that night, as he claims, and so informed the foreman of the shop, who immediately procured another man in the shop to do the work which he was requested to do, the plaintiff is entitled to recover the full sum of $72. The question is, Was there just cause for imposing this additional requirement upon the plaintiff as to the term of his apprenticeship."

The jury rendered a verdict for the plaintiff.

*Clapperton & Owen*, for appellant. ,
*Smedley & Corwin*, for appellee.

GRANT, J. (*after stating the facts*). 1. The contention of defendant is that plaintiff had abandoned his employ, had thereby forfeited his right to the apprentice reserve fund, and that the evidence shows conclusively an act of willful disobedience to the defendant's foreman, which justified the position taken by the superintendent. We cannot concur in the view that an act of willful disobedience was conclusively established.

Plaintiff's version is that when the foreman asked him to work he told him he did not want to work, because it was cold; that he had trouble with his feet; to take the job to some one nearer a stove; and that the foreman said nothing further, but got another man to do the work. The work was done by another employé, and there is no evidence that the defendant was injured by the action of the plaintiff.

If the jury believed the plaintiff, there was no such refusal to work as would justify the defendant in discharging the plaintiff or imposing a penalty for disobedience. *Shaver* v. *Ingham*, 58 Mich. 649, and authorities cited.

2. It is next contended that the plaintiff was not discharged, and that it was his duty to remain until the completion of his three years. The defendant, on the basis of a breach of the contract by plaintiff, told him that he could leave, or continue to work, upon the agreement to remain 30 days above the time provided in the contract. Defendant, under the contract, had no right to make such a requirement, even if he would have been justified in discharging him. The plain inference from the language is, "You are discharged, but you can continue in our employ if you will stay thirty days longer than the original contract provides." In other words, it required the making of a new contract. Plaintiff's acceptance would have annulled the former contract and substituted the other in its place. This he was under no obligation to do, and was justified in leaving. *Trawick* v. *Railway Co.*, 68 Ill. App. 156; *People's Co-operative Ass'n* v. *Lloyd*, 77 Ala. 387; *Whitmarsh* v. *Littlefield*, 46 Hun, 418.

3. It is also urged that the defendant under the contract was entitled to determine for himself the question of willful disobedience. This is based upon the following provision of the agreement:

"If for any acts of disobedience of said party of the second part said party of the first part shall deem it best to discharge said party of the second part, then one-half of the apprentice reserve * * * shall be forfeited to said first party."

This provision does not give the defendant the authority to pass upon what constitutes an act of disobedience. It means that, when an act of disobedience has been committed, the defendant might discharge him should he deem it best. Upon this point, see *Jones* v. *Transportation Co.*, 51 Mich. 539; *Sloan* v. *Hayden*, 110 Mass. 141.

Such arbitrary power must be evidenced by very clear language; but there is nothing in this contract which justifies the conclusion that it was lodged in the defendant.

The judgment is affirmed.

The other Justices concurred.